IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DR. BEVERLY LINDSAY,        :
                                    :
              Plaintiff,       :             No. 4:06-CV-01826
                                    :
     v.                         :            (Judge McClure)
                                    :
THE PENNSYLVANIA STATE     :
UNIVERSITY,                  :
                                    :
             Defendant.     :

## MEMORANDUM [1]

March 11, 2009

## I.  Introduction

On September 18, 2006, plaintiff Dr. Beverly Lindsay instituted this civil action against defendant, the Pennsylvania State University ("Penn State").  In her complaint, plaintiff alleges violations of Title VII of the Civil Rights Act of 1964 (Count I), the Americans with Disabilities Act ("ADA") (Count II), Title IX of the

---

[1] Although some of the information upon which this order is based was provided to the court in sealed documents in accordance with the parties' confidentiality agreement, this memorandum and the accompanying order are not sealed.  We have balanced the litigants' privacy interest against the public's right to obtain information concerning judicial proceedings, and have determined that the public interest outweighs the litigants' privacy interests and this memorandum and the accompanying order will not be sealed.  See generally Pansy v. Borough of Stroudsburg, et. al., 23 F.3d 772 (3d Cir. 1994).

Education Amendments Act of 1972 (Count III), hostile work environment (Count IV), and breach of contract (Count V).

## II. Procedural History

The parties have conducted discovery.[2]  The parties have filed cross-motions for summary judgment; the subject of the instant Memorandum and Order is defendant's motion for summary judgment, filed October 17, 2008.[3]  (Rec. Doc. No. 126).  The parties have filed opposing and responsive briefs and the matter is ripe for disposition.

Now, for the following reasons we will grant defendant's motion for summary judgment and enter final judgment in favor of defendant.

## III.  Factual Background

Taken in the light most favorable to the non-moving party, plaintiff Lindsay, the salient facts are as follows.[4]  Dr. Lindsay began her career at Penn State as a

---

[2]Discovery was not completed before the summary judgment motions were filed.  This court deferred resolution of one outstanding motion that is not relevant to either motion for summary judgment.  That motion is disposed of by order of this same date.

[3]Also ripe for disposition are plaintiff's motion for summary judgment, a multitude of motions to strike or amend documents, and a motion to disqualify counsel.  All are resolved by separate orders filed this same date.

[4]Pursuant to M.D. Pa. L.R. 56.1, the moving party is required to file a statement of material facts in support of the motion for summary judgment, and the

dean in the Office of International Programs ("OIP") and as a tenured full

professor with the College of Education ("COE").  (Rec. Doc. No. 127 at ¶ 3-4).

After a less than favorable review of Dr. Lindsay during the OIP's 5-year review of

her performance, the review committee recommended an immediate change of

leadership, and Dr. Lindsay resigned her deanship.  (Rec. Doc. No. 127at ¶¶ 6-9,

and Rec. Doc. No. 129 at 15a.1-80a).   The deanship resignation was voluntary,

and there is no indication in the signed agreement that racism was the impetus;

although Dr. Lindsay's charge of discrimination alleges the agreement was the

result of allegations of racial discrimination.  (Rec. Doc. No. 129 at 69a-80a, and

Rec. Doc. No. 181-2 at 85a).

The deanship resignation was reduced to writing by contract dated April 17,

2002.  (Rec. Doc. No. 129 at 72a).  Dr. Lindsay was to "resume her tenured

position as Professor of Higher Education and Educational Theory and Policy in

the College of Education."  (Id.)   The terms of the contract further stated that "[i]n

her capacity as Professor of Higher Education and Educational Theory and Policy,

---

non-moving party is required to file a responsive statement of facts.  Both parties
are required to "include references to the parts of the record that support the
statements."   Plaintiff's response to defendant's statement of facts is "replete with
unsupported factual assertions;" as a result we will adopt all of defendant's facts
that are not clearly disputed by plaintiff with adequate references to the record.
See United States ex rel. Stephen Paranich, D.C. v. Deborah Sorgnard, et. al., 286
F. Supp. 2d 445, 447 n.3 (M.D. Pa. 2003),  aff'd, 396 F.3d 326 (3d Cir. 2005).

Employee shall perform the normal and customary functions, duties and responsibilities of tenured professors in the College of Education, as may be assigned by her Department Head in the College of Education." (Id.)  One duty of professors in the Education Theory and Policy program is to teach undergraduate courses.  (Rec. Doc. No. 127 at ¶ 77, and Rec. Doc. No. 129 at 95a).  Because Dr. Lindsay expressed an unwillingness to teach undergraduate level courses, the dean located her program responsibility solely in the Higher Education program.   (Rec. Doc. No. 78 at ¶ 78-83, and Rec. Doc. No. 129 at 96a).

Following her deanship resignation, Dr. Lindsay resumed her tenured position as professor with the COE, in the Department of Education Policy Studies ("EPS").  (Rec. Doc. No. 127 at ¶¶ 9, and 13, and Rec. Doc. No. 129. at 72a and 87a).  The head of the EPS department was Jacqueline Stefkovich, Ph.D. ("Dr. Stefkovich") from 2001-December 2008, and from January 2008 through the present the department head is Gerald LeTendre, Ph.D. ("Dr. LeTendre").  (Rec. Doc. No. 127 ¶ 27).   The department head has the responsibility of recommending to the dean Dr. Lindsay's salary increases.  (Id. at ¶ 25).   The dean of the COE at all times relevant to the instant action has been David Monk  ("Dean Monk").  (Id. at ¶ 16).

Salary evaluations are made each spring, effective for the following school

year (July 1 - June 30th).  (Rec. Doc. No. 127 at ¶¶ 85-86).  During the relevant

time period, Dr. Lindsay received raises between 1.78- 2.01%.  (Id. at ¶¶ 98-121).

Within EPS, Dr. Lindsay was a member of the Hi Ed program.  (Id. at ¶ 19).

The Hi Ed program is lead by a Professor in Charge ("PIC"), who is responsible

for determining which faculty will teach which courses.  (Id. at ¶¶ 33 and 35).  At

all times relevant to this action, the PIC has rotated between Dorothy Evensen,

Ph.D. ("Dr. Evensen") and Roger Geiger, Ph.D. ("Dr. Geiger").  (Id. at ¶ 37-39).

The standard course load for professors is to teach two courses in the fall

semester and two in the spring semester.  (Rec. Doc. No. 127 at ¶ 66).  Professors

could qualify to be released from some of their teaching assignments by securing

an externally funded research grant that offsets their salary in whole or in part.  (Id.

at ¶ 53).   Dr. Lindsay has never qualified for course releases because she has never

secured research funding to offset her salary.  (Id. at ¶ 55). Nevertheless, Dr.

Lindsay taught less than the required number of courses in several semesters (Id. at

¶ 61).   She was able to teach fewer than two courses per semester by requested ad

hoc course releases from her Department Head and/or Dean.  (Id. at ¶ 68-69).  In

addition, Dr. Lindsay has taught independent study courses, which do not count

toward a professor's two courses per semester teaching obligation.  (Id. at ¶ 63-64).

Penn State policy is for employees to fly in coach class seats.  (Rec. Doc. No. 127 at ¶ 168).  Dr. Lindsay provided to Penn State prescriptions for an ergonomic office and business or first class flight seats.  (Rec. Doc. No. 127 at ¶ 139-140 and  Rec. Doc. No. 130-2 at 558a-560a).  As an exception to the COE's travel policy, Dr. Lindsay was approved to fly first or business class.  (Rec. Doc. No. 171 at ¶ 174 and Rec. Doc. No. 146 at 1592).

When Dr. Lindsay began at Penn State in 1996, she negotiated for an executive chair for her office.  (Rec. Doc. No. 127 at ¶ 183 and Rec. Doc. No. 129-2 at 220a). When Dr. Lindsay transferred to the EPS department in 2002, she requested that her chair be transferred to her new office, and this request was granted.  (Rec. Doc. No. 127 at ¶ 185 and Rec. Doc. No. 130-3 at 679a).  In 1998, Dr. Lindsay requested an ergonomic evaluation of her office.  (Rec. Doc. No. 127 at ¶ 184).  The evaluation found the chair to be "fair; large high back executive chair, size does not allow easy access to desk and computer." (Rec. Doc. No. 181-9 at 677a).  Dr. Lindsay also stated that much of her office furniture is ergonomically correct, but she requested an ergonomically correct computer (specifically the monitor and keyboard) and desk.  (Rec. Doc. No. 127 at ¶ 187 and Rec. Doc. No. 130-3 at 679a).  Dr. Lindsay also requested, and was provided with laborers to set up her office in EPS.  (Rec. Doc. No. 127 at ¶ 188 and Rec. Doc. No.  181-10 at

6

680a-682a).  Dr. Lindsay has had surgery for carpal tunnel syndrome.  (Rec. Doc.

No. 127 at ¶ 216).

Dr. Lindsay testified in her deposition that Dr. Stefkovich had yelled at Dr.

Lindsay on several occasions.  (Rec. Doc. No. 127 at ¶ 273-274 and Rec. Doc. No.

129-2 at 228a).  Dr. Lindsay also testified that a colleague used the word "fuck" in

her presence and another college called minority students and faculty "academic

whores".  (Rec. Doc. No. 127 at ¶ 275-276 and Rec. Doc. No. 129-2 at 228a).

Additionally, Dr. Lindsay testified that "several years ago" she was accused of

submitting a dishonest budget.  (Rec. Doc. No. 127 at ¶ 277 and Rec. Doc. No.

129-2 at 228a).

Dr. Lindsay filed allegations of employment discrimination with the EEOC

on January 5, 2005.  (Rec. Doc. No. 181-11 at 730a-736a).  Dr. Lindsay filed a

charge of discrimination with the Pennsylvania Human Relations Commission

("PHRC") on April 1, 2005 and October 5, 2005.  (Rec. Doc. No. 181-2 at 85a-86a

and Rec. Doc. No. 181-11 at 751a-752a).

## IV.  Standard of Review

Summary judgment is appropriate when 1) there are no material facts in

dispute; and 2) one party is entitled to judgment as a matter of law.  Int'l Union,

United Mine Workers of Am. v. Racho Trucking Co., 897 F.2d 1248, 1252 (3d Cir.

1990) (citing Fed. R. Civ. Pro. 56(c)).

The standard by which the court decides a summary judgment motion does not change when the parties file cross-motions.  Weissman v. United States Postal Serv., 19 F. Supp. 2d 254, 259 (D.N.J. 1998). When ruling on cross motions for summary judgment, the court must consider the motions independently, Williams v. Philadelphia Housing Authority, 834 F. Supp. 794, 797 (E.D. Pa. 1993), aff'd, 27 F.3d 560 (3d Cir. 1994), and view the evidence on each motion in the light most favorable to the party opposing the motion.  See Matsushita Elec. Insus. Co., Ltd. v. Zenith Radio corp., 475 U.S. 574, 587 (1986).

A district court may properly grant a motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Material facts" are those which might affect the outcome of the suit.  Id, Justofin v. Metropolitan Life Ins. Co., 372 F.3d 517, 521 (3d Cir. 2004).

Regardless of who bears the burden of persuasion at trial, the party moving

for summary judgment has the burden to show an absence of genuine issues of material fact.  Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1080 (3d Cir. 1996) (citations omitted).  To meet this burden when the moving party does not bear the burden of persuasion at trial, the moving party must show that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the nonmovant's burden of proof at trial.'"  Jalil v. Avdel Corp., 873 F.2d 701, 706 (3d Cir. 1989) (quoting Chippolini v. Spencer Gifts, Inc., 814 F.2d 893, 896 (3d. Cir. 1987)); see Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  More simply put, a party moving for summary judgment who does not bear the burden of persuasion at trial is not required to negate the nonmovant's claim, but only point out a lack of evidence sufficient to support the nonmovant's claim.  Country Floors, Inc. v. Partnership Composed of Gepner and Ford, 930 F.2d 1056, 1061 (3d Cir. 1991).

To the contrary, when the moving party bears the burden of persuasion at trial, it must point to evidence in the record that supports its version of all material facts and demonstrate an absence of material facts.  National State Bank v. Federal Reserve Bank, 979 F.2d 1579, 1582 (3d Cir. 1992).  If the moving party does not meet this burden, the court must deny summary judgment even if the nonmoving party does not produce any opposing evidence.  Id.

Once the moving party meets its burden of showing an absence of genuine issues of material fact, the nonmoving party must provide some evidence that a issue of material fact remains.  Matushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  The nonmoving party, however, cannot do so by merely offering general denials, vague allegations, or conclusory statements; rather the party must point to specific evidence in the record that creates a genuine issue as to a material fact.  Celotex, 477 U.S. at 32; Ridgewood Bd. of Educ. v. N.E. ex rel. M.E., 172 F.3d 238, 252 (3d Cir. 1999).

## V.  Discussion

### Counts I and III

### Racial Discrimination in Violation of Title VII of the Civil Rights Act of 1964
and
### Sex Discrimination and Retaliation in Violation of Title IX of the Education Amendments Act of 1972

Title VII prohibits employment practices that result in disparate treatment (intentional discrimination) if the practices are based in any way on race.  See 42 U.S.C. § 2000e-2.

It shall be an unlawful employment practice for an employer–
(1) to fail or refuse to hire or to discharge any individual, or otherwise
to discriminate against any individual with respect to his compensation,
terms, conditions, or privileges of employment, because of such individual's race, color, r
(2) To limit, segregate  or  classify  his  employees  or  applicants  for
employment in any way which would deprive or tend to deprive any

10

individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex or national origin.

42 U.S.C. § 2000e-2(a).

The Education Amendments Act of 1972 provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance" with certain enumerated exceptions. 20 U.S.C. §1681(a). The term "program or activity" includes "all of the operations of...[a] university." 20 U.S.C. §1687(2)(A).

Because Title IX does not specify a statute of limitations period, the Third Circuit has borrowed Pennsylvania's two year statute of limitations period applicable to personal injury actions. See Bougher v. University of Pittsburgh, 882 F.2d 74, 77-78 (3d Cir. 1989). This action was filed September 18, 2006, so any unlawful acts based on sex discrimination committed before September 18, 2004, are time barred. See id.

Because the evidence plaintiff sets forth in her Title VII claim is characterized as 'indirect' evidence of discrimination, this claim is analyzed using the well-established McDonnell Douglas burden-shifting framework. See McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). The Title VII McDonnell Douglas standard is also applied to Title IX claims. See Kemether v.

11

Pennsylvania Interscholastic Athletic Ass'n, Inc., 15 F.Supp.2d 740, 755 (E.D. Pa. 1998).  Both Penn State and Dr. Lindsay refer to the same arguments for both claims in their brief, so we find it easiest to analyze both claims together here as well[5].  (Rec. Doc. No. 143 at 30-31 and Rec. Doc. No. 162 at 24-26).

"[T]he Mc Donnell Douglas analysis proceeds in three stages."  Jones v. Sch. Dist. of Philadelphia, 198 F.3d 403, 410 (3d Cir. 1999).  First, plaintiff must establish a prima facie case of discrimination.  See id.  Plaintiff makes a prima facie case by showing 1) she is a member of a protected class; 2) she suffered an adverse employment action; and 3) the action occurred under circumstances that could give rise to an inference of intentional discrimination. See Ogden v. Keystone Residence, 226 F. Supp. 2d 588, 602 (M.D. Pa. 2002), and see Makky v. Chertoff, 541 F.3d 205, 214 (3d. Cir. 2008). "An adverse employment action "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."" Ogden, 226 F. Supp. 2d at 602-603, citing Cardenas v. Massey, 269 F.3d 251, 267 n.10 (3d Cir. 2001).   At the

---

[5]Although Dr. Lindsay included "retaliation" in the title of Count III, she does not make an allegation of retaliation in her complaint.  Thus, we will disregard the retaliation portion of the title, as she failed to plead retaliation in the complaint.

prima facie stage of the analysis, the court merely determines if plaintiff has presented sufficient evidence so that we should move on to the second step of analysis.  Jones, 198 F.3d. at 412.

Second, if plaintiff is successful in making out a prima facie case, the burden shifts to the defendant to articulate a "legitimate, nondiscriminatory reason for the employee's rejection."  Jones, 198 F.3d at 410, (citing McDonnell Douglas, 411 U.S. at 802).  The employer's burden is satisfied by simply explaining its actions or producing evidence of a legitimate nondiscriminatory reason.  See Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 245, 255 (1981).  This burden is merely one of production, not one of persuasion.  See id. at 256-258.   Defendant's explanation of its legitimate reasons must be clear and specific.  Id. at 258.

Finally, if defendant carries this burden, plaintiff must prove by a preponderance of the evidence that the legitimate reasons offered by defendant were a pretext for discrimination. Jones, 198 F.3d at 410.  Most cases turn on this third step, i.e. whether plaintiff can establish pretext.  Id.  "At this point the court focuses on whether there is sufficient evidence from which a jury could conclude that the purported reasons for defendant's adverse employment actions were in actuality a pretext for intentional race discrimination." Id. at 412.  "At trial, the plaintiff must convince the finder of fact "*both* that the reason was false, *and* that

13

the discrimination was the real reason." <u>Id.</u> at 412-413 (citing <u>St. Mary's Honor</u>

<u>Ctr. v. Hicks</u>, 509 U.S. 502, 515 (1993) (emphasis in original).

Plaintiff may defeat a motion for summary judgment by pointing to some

evidence from which a reasonable factfinder would either 1) disbelieve the

employer's articulated legitimate reasons; or 2) believe that an invidious

discriminatory reason was more likely than not a motivating or determinative cause

of the employer's action.  <u>Jones</u>, 198 F.3d at 413.  This gives plaintiff two possible

avenues to defeat a motion for summary judgment.  "Plaintiff cannot simply show

that the employer's decision was wrong or mistaken. . .rather, the nonmoving

plaintiff must demonstrate such weakness, implausibilities, inconsistencies,

incoherencies, or contradictions in the employer's proffered legitimate reasons for

its actions that a reasonable factfinder could rationally find them unworthy of

credence." <u>Fuentes v. Perskis</u>, 32 F.3d 759, 765 (3d Cir. 1994). "Plaintiff also may

survive summary judgment by pointing to evidence in the record which "allows the

factfinder to infer that discrimination was more likely than not a motivating or

determinative cause of the adverse employment action."" <u>Jones</u> 198 F.3d at 413

(citing <u>Fuentes</u>, 32 F.3d at 764).  For example, to prove this prong, plaintiff may

show that the employer has previously discriminated against plaintiff, or others in

plaintiff's protected class, or that the employer has treated more favorably similarly

situated persons not within the protected class. See Jones, 198 F.3d at 413.

Plaintiff alleges in her complaint that her department head, Dr. Stefkovich, did not address discriminatory student comments in March/April 2004; that she received substantially lower raises than her similarly situated colleagues; that she had a larger course load than colleagues; that she was not consistently assigned to teach classes in her area of expertise as her colleagues were; that defendant failed to accommodate or allow travel compared to Caucasian male colleagues; and that defendant failed to accommodate medical needs contrary to the accommodation of Caucasian male colleagues.

As an initial matter, we point out that Dr. Lindsay attempts to raise, for the first time in her brief opposing summary judgment, new theories of her case.[6]  We will not consider these new theories at this stage in the proceedings.  As this court has previously stated, "[p]laintiff cannot change her theory midstream, after the close of discovery and while opposing party's summary judgment motion is pending."  Ellis v. The Pennsylvania State University, 4:CV-99-01356 at 20 (M.D. Pa. 2003),  citing Fatir v. Dowdy, 2002 WL 2018824 (D. Del. 2002).  Furthermore,

---

[6]The new theories plaintiff attempts to raise are: failure to promote; reprimand for teaching a small class; exclusion from various committee meetings; exclusions from videos, conferences, and publications; reprimands for failing to advise/mentor students; accusations of submitting a dishonest budget; raised voices/yelling directed at plaintiff; and complaints made by other persons of color.

15

"[t]here is no excuse or justification for plaintiff's attempt to fend off summary judgment with a newly asserted claim."  Saini v. Bloomsburg, 826 F. Supp. 882, 890 (M.D. Pa. 1993).

Dr. Lindsay's assertion that Dr. Stefkovich submitted a memo to plaintiff in which she did not address comments by students that were discriminatory does not pass the prima facie stage of the analysis.  Failing to address allegedly discriminatory student comments is not a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'"  See Ogden, 226 F. Supp. 2d at 602-603.  This allegation is not an adverse employment action for purposes of McDonnell Douglas analysis and does not make out a prima facie case of discrimination.  However, with regard to the remainder of her contentions, we find Dr. Lindsay has established a prima facie case of discrimination, and consider each evidentiary submission in turn.

1.  Dr. Lindsay's Raises

Penn State avers that Dr. Lindsay was the fourth highest paid professor in her department for the years in question.  (Rec. Doc. No. 143 at 14). Salary evaluations are made each spring, to be effective for the following school year (July 1 - June 30th).  (Rec. Doc. No. 127 at ¶¶ 85-86).  Faculty whose performance

16

meets expectations should receive a raise of at least 1.5%. (Id. at ¶ 100). During the relevant time period, Dr. Lindsay received raises between 1.78- 2.01%. (Id. at ¶¶ 98-121).

The EPS Department Head, Dr. Stefkovich, was responsible for recommending Dr. Lindsay's raises to Dean Monk, who is the final decision maker. (Rec. Doc. No. 143 at 14). Dr. Stefkovich's recommendation is based on Dr. Lindsay's performance, as evaluated by Dr. Stefkovich and the Center for the Study of Higher Education Director, Dr. Colbeck. (Id.) Penn State asserts that the reason Dr. Lindsay's raises were not as high as the four professors who received higher raises was because her performance was not as exemplary to support a higher merit-based increase, and she did not qualify for equity-based increases due to her already high salary. (Id. at 14-15). Penn State explains that even though Dr. Lindsay had commendable service, particularly presenting at professional conferences, she lagged behind her colleagues in the areas of teaching, advising students, and obtaining research grants. (Id. at 15).

To support their legitimate, nondiscriminatory reason, Penn State cites to the affidavits of Dr. Stefkovich and Dean Monk, (Rec. Doc. Nos. 181-20 and 181-19)[7]

---

[7]We are aware that portions of these two affidavits are the subject of a Motion to Strike by plaintiff which is disposed of by Order of this same date. We have not utilized any portions of the affidavits which do not comply with Fed. R.

and to the supplemental affidavits of Dr. Stefkovich and Dean Monk (Rec. Doc.

Nos. 182-3 at 22-39 and 45-82).   Dr. Stefkovich attests that the merit-based raises

she suggests are based on professors' accomplishments in the prior academic year.

(Rec. Doc. No. 182-3 at ¶ 4).  She evaluates professors based on their teaching,

research and service accomplishments.  (Id. at ¶ 13).  Student evaluations are an

important factor in evaluating performance.  (Id. at ¶ 15).  Research responsibilities

include publishing work, presenting at conferences, obtaining external grant

funding and researching for grants.  (Id. at ¶ 16).  Dr. Stefkovich attests that Dr.

Lindsay's performance was satisfactory, and sometimes better than satisfactory,

but did not rise to the level of accomplishment as the professors plaintiff identifies

as similarly-situated.  (Id. at ¶ 22-23).  Because her performance was not as strong

as her comparators, she received a smaller percentage merit-based raise.  (Id. at 24-

25) Her salary was lower than three of her comparators but greater than the other

three. (Id.)  To support her contention that Dr. Lindsay's performance was not as

strong as others, Dr. Stefkovich detailed the performance of Dr. Lindsay and her

comparators.  (Id. at ¶ 31-46).  Furthermore, Dr. Stefkovich attested that Dr.

Lindsay did not qualify for an equity-based raise due to her already high salary.

---

Civ. P. 56(e)(1).

(Rec. Doc. No. 181-20 at ¶ 25).

Penn State has met its burden of production by producing evidence that Dr. Lindsay's merit-based salary increases were lower than similarly-situated colleagues because her performance was not as strong and that she did not receive an equity-based salary increase for the years in question due to her already high salary. Penn State clearly and specifically explained a legitimate nondiscriminatory reason.   Thus, the burden shifts back to Dr. Lindsay to prove by a preponderance of the evidence that the reasons Penn State set forth were a pretext for discrimination.

In Dr. Lindsay's brief opposing summary judgment, she argues that the current department head, Gerald LeTendre (who took over from Dr. Stefkovich in 2008), a professor-in-charge, Dr. Geiger, and the director of the Center for the Study of Higher Education, Dr. Colbeck, have admitted that the evaluation process is subjective, as opposed to objective.  (Rec. Doc. No. 162 at 12). She also argues (somewhat confusingly) that because Penn State states that one of the reasons Dr. Lindsay did not qualify for an equity-based raise is that she had a high salary already, as she is the fourth highest professor in her department, that Penn State has made a mistake in their comparator group because she earned her first degree earlier than Penn State thinks she earned her degree, thus defendant is not

comparing "apples to apples." (Id. at 11-12).

In neither argument has Dr. Lindsay provided sufficient evidence from which a jury could conclude that Penn State's proffered reasons are pretextual. See Jones, 198 F.3d at 410.   Arguing that Penn State should have used an earlier date to calculate the date of Dr. Lindsay's first degree[8] does nothing to suggest that race or sex played a factor in the equity-based raise decisions.   "Plaintiff cannot simply show that the employer's decision was wrong or mistaken. . .rather, the nonmoving plaintiff must demonstrate such weakness, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence." Fuentes, 32 F.3d at 756.  The only argument that Dr. Lindsay has made regarding the equity-based increase is that Penn State was mistaken. Dr. Lindsay has made no argument by pointing to evidence from which a reasonable factfinder would either disbelieve Penn State's articulated reasons or believe that Penn State was motivated by discriminatory reasons.  See Jones, 198 F.3d at 413.

---

[8]Penn State indicates that although date of degree can factor into the regression analysis used to determine if an equity increase in salary (as opposed to merit increase) is justified, regardless, the date Dr. Lindsay suggests still would not have resulted in an equity based increase because her salary was already high. (Rec. Doc. No. 186-10-11).

With regards to the merit-based increase, Dr. Lindsay argues that there is a problem with the evaluation process because LeTendre, Geiger, and Colbeck have admitted that the evaluation process is subjective.   (Rec. Doc. No. 162 at 12-13). Again, this does nothing to suggest that Penn State's assertion that Dr. Lindsay's performance was not as strong as those who received higher merit-based increases is pretext. Most employee evaluations contain subjective elements. Subjectivity alone, without more, does not evince discrimination. Dr. Lindsay does not put forth evidence that discrimination was involved in the subjective portion of her evaluation, or evidence that would cause a factfinder to disbelieve Penn State's articulated reason. In fact, she makes no argument regarding discrimination; her argument is that subjectivity, alone, is inappropriate in evaluations.  She makes no argument nor sets forth any evidence to show that sex and/or race factored into her merit-based increases.

2.  Dr. Lindsay's Course Load

According to department guidelines produced by Penn State, professors are expected to teach two courses in the fall semester and two courses in the spring. (Rec. Doc. No. 143 at 16 and Rec. Doc. No. 129-2 at 204a-213a).  Professors can earn a course release by securing external grant funding to offset their salary.  (Id.)

According to the affidavit of David Heller, Director of the CHSE, during all time periods at issue, Dr. Lindsay never secured external grant funding to qualify for a course release.  (Id. and Rec. Doc. No. 181-15 at ¶3).  Nevertheless, in several semesters, Dr. Lindsay was given approval to teach less than the standard course load.  Specifically, she taught the following: spring 2003, one course; fall 2003, two courses; spring 2004, one course; fall 2004, one course; spring 2005, two courses; fall 2005, two courses; spring 2006, one course; fall 2006, two courses; spring 2007, one course; fall 2007, two courses; spring 2008, two courses.  (Rec. Doc. No. 127 at ¶61).   Penn State produced evidence of a legitimate nondiscriminatory reason for not giving Dr. Lindsay a lighter course load: that the written department policy is for professors to teach two classes each semester unless they earn grants to offset their salary; and that Dr. Lindsay has never earned grant funding to qualify for course releases.  (Rec. Doc. No. 129-2 204a-217a and Rec. Doc. No. 181-15 at ¶ 3).

The burden shifts back to Dr. Lindsay to show Penn State's reasoning is a pretext for discrimination. Dr. Lindsay argues that she was granted course releases based on approval from her Department Head, that she was commended for her presentations at national conferences, publications and Fulbright grants and was granted releases based upon her accomplishments.  (Rec. Doc. No.  162 at 13).

Again, Dr. Lindsay makes no argument of sex or race discrimination.  In fact, her argument that she was granted course releases based on approval from her department head seems to cut the other way - that she was granted preferential treatment despite not securing external funding as per department policy.  Not only has Dr. Lindsay not provided any evidence that Penn State's proffered reason is false, but she has not provided any evidence that discrimination was the real reason.  In fact her argument seems to be that she was treated preferentially.

3.  Courses in Dr. Lindsay's Area of Expertise

On June 12, 2002, Dr. Lindsay sent an email to Dr. Stefkovich in which she offered to teach the following courses: a course based on her book, THE QUEST FOR EQUITY IN HIGHER EDUCATION, Comparative Higher Education, Administration in Higher Education, Sociology of Higher Education, Leadership in Higher Education and Women's Education and Development. (Rec. Doc. No. 143 at 16 and Rec. Doc. No. 181-2 at 18).   According to Dr. Evensen's affidavit, since that email, Dr. Lindsay has taught four of those six courses, and has taught those four in multiple semesters.  (Rec. Doc. No. 181-13 at ¶ 8).   Penn State has met its burden of producing evidence of a legitimate nondiscriminatory reason.  They have shown that Dr. Lindsay has been able to teach most, although not all, of the courses she requested to teach.

Dr. Lindsay really does nothing to dispute this.  She argues that she

repeatedly had to ask to teach these courses, and cites to her own statement of

material facts, which, again makes a bald assertion with no evidence to support her

claim.  Yet again, Dr. Lindsay fails to point to any evidence that would lead a

reasonable factfinder to disbelieve Penn State or to believe that there was any

discriminatory animus behind her course assignments.  See Jones 198 F.3d at 413.

4.  Travel

Penn State again argues that Dr. Lindsay was not discriminated against, but

received favorable treatment in regards to her travel arrangements.  (Rec. Doc. No.

143 at 17).  She was granted an exception to travel first or business class.  (Rec.

Doc. No. 143 at 17 and Rec. Doc. No. 146 at 1592).  According to Dr. Colbeck,

who was responsible for the budget, every professor in the department receives the

same flat rate travel allocation, which the professors could use as they wished.  (Id.

and Rec. Doc. No. 129-2 at 197a).   According to the emails produced, when Dr.

Lindsay requested more money for a trip to Greece, she was provided with $1,000

more than the flat rate allocation..   (Rec. Doc.  No. 143 at 17 and Rec. Doc. No.

130-2 at 562a-565a). She was entitled to $2,000 for travel based on her status as a

faculty member with a partial appointment to the Center for the Study for Higher

Education.  (Rec. Doc. No. 127 at ¶ 176-177 and Rec. Doc. No. 181-6 at 617a-

24

618a).  She was given an additional $1,000 for the trip -$500 in recognition of her

accomplishments as a Fulbright scholar and $500 from the Office of International

Programs.  (Id.)  Again, Penn State has met its burden of production by showing

that Dr. Lindsay was not discriminated against, but actually treated preferentially.

The burden shifts back to plaintiff to prove by a preponderance of the

evidence that Penn State's reasons are pretextual.  Dr. Lindsay mostly argues the

ADA standard, which is not relevant to her race or sex claims. However, she also

argues that she was denied travel funds and that two Caucasian professors were

granted additional travel funds.  (Rec. Doc. No. 162 at 14).  However, her claim

that she was denied travel funds is only supported by her Revised Statement of

Material Facts, and there is no citation to any evidence on the record that she was

denied funds - not even a citation to her own affidavit.

With regard to her assertion that Professors Terenzini and Reason were

provided additional funds, she cites to an email she wrote to herself.  (Rec. Doc.

No. 147-2 at 34).[9]  This email was dated September 21, 2007, almost one-year to

---

[9]Dr. Lindsay's citation is to her own Revised Statement of Material Facts
(Rec. Doc. No. 145 at ¶ 69).  She cites exhibit GG, which I was able to find at Rec.
Doc. No. 147-2 as cited above.  However, she also cites "N.T. pp 200-201."  I am
completely at a loss to figure out what "N.T." refers to.  It does not refer to the
universal Bates Stamp numbers that Penn State cites to, because 200-201 are a
deposition of Dr. Heller and seem completely unrelated to Dr. Lindsay's travel
budget or arrangements.  Dr. Lindsay's List of Exhibits (Rec. Doc. No. 144-4) does

the day after the complaint was filed.  (<u>Id.</u>)  In it, Dr. Lindsay writes to herself

"Terenzini replied, "Travel funds have been requested and given funds were not

available."" (<u>Id.</u>)  "Terenzini stated that he did not know where the funds came

from; but they were provided to him outside regular travel funds."  (<u>Id.</u>)  This

email, authored by Dr. Lindsay, during the pending litigation, is not enough to

defeat a motion for summary judgment.  It, standing alone, is insufficient to show

that Penn State's legitimate, nondiscriminatory reason proffered is pretextual.

5.  Medical Needs

Penn State again argues that not only did it not discriminate against Dr.

Lindsay with regard to her medical needs; she was given preferential treatment.

(Rec. Doc. No. 143 at 17-21).  With regards to her office, Penn State acquiesced to

all of Dr. Lindsay's requests.  (Rec. Doc. No. 143 at 18).   Dr. Lindsay's executive

chair was transferred from her former department, movers were hired to arrange

---

not point to the location of N.T. 200-201 either, as the list is organized using
letters, none of which includes an exhibit titled "N.T."   This court has been
extremely accommodating in locating exhibits on the record.  I have been the "pig
searching for truffles" which I have said before that this court will not be, in
attempting to find evidence that has a citation to one of the thousands of pages of
documents on the record.  Neither party has made this an easy job with the
voluminous record and citations not to ECF, or even some joint numbering system,
but each has its own system, without explanation on ECF as to what that is.  So
with regard to exhibit "N.T. 200-201, " this "truffle" cannot be found, and thus will
not be considered.

furniture and unpack her office, she had an ergonomic evaluation of her office, and she was authorized to purchase certain ergonomically correct items in accordance with that evaluation.  (Rec. Doc. No. 143 at 19, Rec. Doc. No. 130-3 at 694a, 679a and 700a-791a and  Rec. Doc. No. 181-10 at 684a).

Dr. Lindsay started work in EPS on January 14, 2003, and her computer was installed on January 27, 2003.  (Rec. Doc. No. 127 at 193-194).  On February 4, 2003, Dr. Lindsay followed up her prior request for ergonomically correct equipment.  (Rec. Doc. No. 127 at ¶ 196 and Rec. Doc. No. 130-3 at 691a).  An ergonomics evaluation was conducted on February 12, 2003.  (Rec. Doc. No. 127 at ¶ 200 and Rec. Doc. No. 130-3 at 694a-695a).  The ergonomics evaluation recommended an enlarged keyboard platform and a chair, along with several other adjustments such as moving her phone closer and taking breaks from sitting. (Rec. Doc. No. 127 at ¶ 201 and Rec. Doc. No. 130-3 at 694a and 695a).  The department approved the purchase of a new chair and keyboard platform as recommended, and also approved the purchase of a new keyboard and a computer mouse. (Rec. Doc. No. 127 at ¶ 202 and Rec. Doc. No. 130-3 at 701a-702a).

The day after the evaluation took place, Dr. Lindsay was asked to contact a local office equipment store to purchase a chair, to look through the General Stores catalog to choose a keyboard platform and mouse for the university to order, and

confirmed that an ergonomic keyboard was previously provided.  (Rec. Doc. No. 127 at ¶ 203 and Rec. Doc. No. 181-10 at 703a).  Dr. Lindsay confirmed that she had possession of the ergonomic keyboard, and she had received the catalog and had begun the search for the chair.  (Rec. Doc. No. 127 at ¶ 204 and Rec. Doc. No. 181-10 at 704a).  On February 24, 2003, Dr. Lindsay confirmed that she had purchased a new computer mouse.  (Rec. Doc. No. 127 at ¶ 205 and Rec. Doc. No. 181-10 at 705a). Dr. Lindsay found a keyboard platform, but the incorrect one was delivered.  (Rec. Doc. No. 127 at ¶ 210 and Rec. Doc. No. 181-10 at 709a).  (Id.) A staff assistant contacted Dr. Lindsay on November 12, 2003, to follow up on the status of the chair and keyboard platform, and Dr. Lindsay was still searching for a suitable chair and keyboard platform. (Rec. Doc. No. 127 at ¶ 210 and Rec. Doc. No. 181-10 at 709a).

On December 4, 2003, plaintiff's then-counsel wrote to Penn State regarding the fact that plaintiff did not have a new chair and keyboard platform. (Rec. Doc. No. 127 at ¶ 211).  Dr. Lindsay was advised by Penn State to follow up with the person who had done her prior ergonomic evaluations, which she did in March 2004, and he elaborated on his previous ergonomic assessment.  (Rec. Doc. No. 127 at ¶ 212-214 and Rec. Doc. No. 181-10 at 713a-715a).  She also requested that he purchase a chair for her, but he advised that his department could not procure

28

equipment, although that he would help her in selecting a chair.  (Rec. Doc. No. 127 at ¶ 218 and Rec. Doc. No. 181-10 at 724a.)

In October 2004, Dr. Lindsay emailed Dr. Stefkovich to advise that she had tested a chair on a trial basis, but it did not work for her; thus she ordered another trial chair.  (Rec. Doc. No. 127 at ¶ 221 and Rec. Doc. No. 181-10 at 727a).  A staff assistant then suggested that Penn State order for Dr. Lindsay's office the same chair she uses in her home office.  (Rec. Doc. No. 127 at ¶ 222 and Rec. Doc. No. 181-10 at 728a).  Dr. Lindsay responded that that chair was no longer available.  (Rec. Doc. No. 127 at ¶ 223 and Rec. Doc. No. 181-10 at 728a).  The staff assistant next suggested that the vendor may be able to find a similar chair, to which Dr. Lindsay replied, "a "trial" chair has been ordered."  (Rec. Doc. No. 127 at ¶ 224-225 and Rec. Doc. No. 181-10 at 728a).

On January 10, 2005, Dr. Lindsay wrote a memo to Dr. Stefkovich advising that her office does not accommodate her physical limitations.  (Rec. Doc. No. 127 at ¶ 229 and Rec. Doc. No. 181-11 at 737a).

A meeting between Dr. Lindsay, Dr. Stefkovich, and Gerald Henry (the Human Resources manager in the COE) was held on February 11, 2005.  (Rec. Doc. No. 127 at ¶ 237).  During this meeting, they called an office chair vendor, Supply Source, and made arrangements for Supply Source to continue efforts with

Dr. Lindsay to find a chair.  (Rec. Doc. No. 127 at ¶ 242 and Rec. Doc. No. 183-6

at 748a).  On February 22, 2005, Dr. Lindsay, Mr. Henry and a Supply Source

representative met in plaintiff's office.  (Rec. Doc. No. 127 at ¶ 244).  The

representative agreed to attempt to find a chair.  (Id.)  He noted that Dr. Lindsay's

desk would not accommodate a larger keyboard platform, so Mr. Henry requested

he find an appropriate desk.  ( Id. at ¶ 245)  Supply Source provided Dr. Lindsay

with a trial chair.   (Id. at 246).

On October 6, 2005 Supply Source delivered two chairs to Dr. Lindsay.

(Rec. Doc. No. 127 at ¶ 251).  Dr. Lindsay acknowledged that the chairs were

satisfactory.  (Rec. Doc. No. 127 at ¶ 255).  At some point (it is not clear exactly

when from the record) Dr. Lindsay was provided with a satisfactory chair.  (Rec.

Doc. No. 127 at ¶ 227 and Rec. Doc. No. 129-2 at 225a). No desk or keyboard

platform has been acquired; however, Dr. Lindsay's authorization to buy new ones

is still valid. (Rec. Doc. No. 127 at ¶ 258-259).  Once again, Penn State's

legitimate, nondiscriminatory reason produced is that there was no discrimination

against Dr. Lindsay; in fact, she was treated preferentially.

Thus the burden shifts back to Dr. Lindsay to prove pretext by a

preponderance of the evidence.  See Jones, 198 F.3d at 410.  Dr. Lindsay first

argues that defendant failed to provide evidence of its attempts to satisfy her

request for ergonomic furnishings.  (Rec. Doc. No. 162 at 14).  This is a very

puzzling argument indeed, as the record is replete with evidence of Penn State's

attempts to satisfy Dr. Lindsay.  Dr. Lindsay also argues that the burden was

placed on her to find acceptable office equipment, and this is unacceptable under

the ADA.  Why Dr. Lindsay makes an argument regarding the Americans With

Disabilities Act in trying to survive a motion for summary judgment on her Title

VII race discrimination and Title IX sex discrimination claims is unclear.  Needless

to say, once again, Dr. Lindsay has made no attempt to point to any evidence that

would cause a reasonable factfinder to believe that Penn State's handling of Dr.

Lindsay's requests for an ergonomic office were motivated or caused by a

discriminatory animus.  See Jones 198 F.3d at 413.


Thus, Dr. Lindsay's first and third claims, Race Discrimination in Violation

of Title VII and Sex Discrimination and Retaliation in Violation of Title IX both

fail as a whole.  We will grant defendant Penn State's Motion for Summary

Judgment on these two claims.

## Count II

## Failure to Accommodate in Violation of the Americans with Disabilities Act

The ADA adopts the enforcement scheme and procedures of Title VII of the

Civil Rights Act of 1964.  See 42 U.S.C. §§ 2000e-4 - 2000e-9, and see 42 U.S.C.

§ 12117(a).  Because Pennsylvania is a deferral state, a claimant who wishes to

bring a civil suit must first file a charge of discrimination with the Equal

Employment Opportunity Commission ("EEOC") within 300 days of the alleged

discriminatory act.  See 42 U.S.C. § 2000e-5(e), and see Colgan v. Fisher

Scientific Co., 935 F.2d 1407, 1413-15 (3d Cir. 1991).  Dr. Lindsay's charge of

employment discrimination was received by the EEOC on January 5, 2005.  (Rec.

Doc. No. 181-11 at 730a - 736a).  Thus, any claims based on allegations prior to

March 11, 2004 are time-barred.

  The ADA prohibits employers from discriminating on the basis of disability.

See 42 U.S.C. § 12111 et. seq.

> No [employer] shall discriminate against a qualified individual with a
> disability because of the disability of such individual in regard to job
> application procedures, the hiring, advancement, or discharge of
> employees, employee compensation, job training, and other terms,
> conditions, and privileges of employment.

42 U.S.C. § 12112(a).  The term "discriminate" means, inter alia, "not making

reasonable accommodations to the known physical or mental limitations of an

otherwise qualified individual with a disability who is an applicant or employee,

unless such covered entity can demonstrate that the accommodation would impose

an undue hardship on the operation of the business of such covered entity."  42

U.S.C. § 12112(5)(A).   "The term "reasonable accommodation" may include – (A) making existing facilities used by employees readily accessible to and useable by individuals with disabilities..."  42 U.S.C. § 12111(9).  "The term "qualified individual with a disability" means an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8). "The term "disability" means, with respect to an individual – (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."  42 U.S.C. §12102(2).

Plaintiff alleges in her complaint that her office lacked basic necessities, including no phone or computer; that she did not have an ergonomically correct office; and that she needed accommodations for travel, specifically noting a trip to Greece where travel accommodation was denied.   Nowhere in the complaint does she specify what her alleged disability is, other than to say she suffers from "various medical conditions."  (Rec. Doc. No. 1 at ¶ 24).  She filed a charge of discrimination with the EEOC and two charges of discrimination with the PHRC, and she did not specify her disability in any of  those documents.  (Rec. Doc. No. 181-11 at 730a-736a and 751a-752a, and Rec. Doc. No. 181-2 at 85a-86a).

According to her ADA Intake Questionnaire, Dr. Lindsay listed her disabilities as bi-lateral carpal tunnel syndrome, bi-lateral ulna syndrome, osteoarthritis, bursitis, and spinal curvature.  (Rec. Doc. No. 181-8 at 660a).

Penn State's first argument is that Dr. Lindsay has not shown that she has a disability.  According to plaintiff's opposing brief, she has a physical impairment that limits her ability to continuously use and move her hands/wrists, to take flights over six hours, lift luggage or other heavy items, walk for certain distances or periods of time, use a keyboard, drive for more than a few hours at a time, and sit for a prolonged period in non-ergonomic seating.  (Rec. Doc. No. 162 at 18).  To substantiate her claims, plaintiff cites to paragraphs 5 and 6 of her Revised Statement of Material Facts.  (Id.)  Both paragraphs are recitations of the same without citations to more.

"It is insufficient for individuals attempting to prove disability status under this test to merely submit evidence of a medical diagnosis of an impairment." Toyota Motor Mfg, Ky Inc. v. Williams, 534 U.S. 184, 198 (2002).  Dr. Lindsay must show her major life activity limitation is substantial.  See id. According to 29 C.F.R. § 1630.2(i) a "major life activity" under the ADA means "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."   "Substantially limited" in regards to a major

life activity means a condition that renders her

> (i) Unable to perform a major life activity that the average person in
> the general population can perform; or (ii) Significantly restricted as
> to the condition, manner or duration under which an individual can
> perform a particular major life activity as compared to the condition,
> manner or duration under which the average person in the general
> population can perform that same major life activity.

Vierra v. Wayne Mem. Hosp., 168 Fed. Appx. 492, 496 (3d. Cir. 2006), citing 29

C.F.R. § 1630.2(j)(1).

It appears that Dr. Lindsay fails to appreciate the nature of the restriction

required to qualify as disabled.  Although she may experience discomfort typing,

lifting heavy items, sitting for long periods of time, and walking for distances or

periods of time, her discomfort does not make her unable to perform a major life

activity that the average person in the general population can perform.  Most

people in the general population would agree that they feel the same discomfort

that Dr. Lindsay experiences.  Dr. Lindsay has provided no evidence that she is

substantially limited in any major life activity.  She has provided prescriptions that

suggest she should take a first-class, as opposed to coach-class seat on flights.

(Rec. Doc. No. 145 at ¶¶ 3 and 12 and Rec. Doc. No. 146 at 3 and 43-48) but we

fail to see how flying is comparable to the major life activities contained in the

EEOC regulations. See 29 C.F.R. § 1630.2(i) Dr. Lindsay also points to evidence

that Penn State allowed her to consider the tips she gives to porters as a travel

expense.  (Rec. Doc. No. 162 at 18, Rec. Doc. No. 145 at ¶¶ 13 and 62 and Rec. Doc. No. 146 at 49).  Although lifting is a manual task, she hasn't shown that she is substantially limited in her ability to lift luggage compared to the average person in the general population.

Nor has she set forth evidence that she is substantially limited in the major life activity of working.  To be substantially limited in the major life activity of working, a plaintiff must be precluded from employment in a class of jobs rather than just a particular job. 29 C.F.R. § 1630.2(j)(3)(i).  She provided prescriptions that show she could benefit from an ergonomic workplace. (Rec. Doc. No. 162 at 18, Rec. Doc. No. 145 at ¶ 3 and Rec. Doc. No. 146 at 3).  But she has done nothing to show that she is substantially limited in working.  Most individuals in the general population could "benefit from an ergonomic workplace."  We do not find she is substantially limited as to any major life activity.  Thus, she is not disabled as defined by the ADA.

Because Dr. Lindsay has failed to show that she has a disability as defined by the ADA, we find that Count II, Failure to Accommodate in Violation of the ADA, fails.  We will grant Penn State's motion for summary judgment on Count II.

<u>Count IV</u>

Hostile Work Environment

To succeed in making a hostile work environment claim, plaintiff must

establish five elements:

> (1) the employee suffered intentional discrimination
> because of her sex; (2) the discrimination was pervasive
> and regular; (3) the discrimination detrimentally affected
> the plaintiff; (4) the discrimination would detrimentally
> affect a reasonable person of the same sex in that
> position; and (5) the existence of respondeat superior
> liability.

Kunin v. Sears Roebuck & Co., 175 F.3d 289, 293 (3d Cir. 1999) (citing Andrews

v. City of Philadelphia, 895 F.2d 1469, 1482 (3d Cir. 1990)).  "Hostile work

environment claims based on racial harassment are reviewed under the same

standard as those based on sexual harassment."   AMTRACK v. Morgan, 536 U.S.

101, 116 n.10 (2002).

In determining whether a work environment is hostile, we must look at the

totality of the circumstances.  Harris v. Forklift Sys., 510 U.S. 17, 23 (1993).  In

doing so, incidents of harassment should not be considered in isolation, but must

be evaluated on the basis of their cumulative effect.  Durham Life Ins. Co. v.

Evans, 166 F.3d 139, 155 (3d Cir. 1999) (citations omitted).  As a result, plaintiff's

harassment claim will survive summary judgment if plaintiff presents sufficient

evidence to give rise to an inference that the harassment altered the conditions of

the victim's employment and created an abusive working environment.

Pennsylvania State Police v. Suders, 542 U.S. 129, 146 (2004) (quoting Meritor

Savings Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986)).

"Hostile environment claims are different from discrete acts."  AMTRACK

v. Morgan, 536 U.S. 101, 115 (2002).  "Their very nature involves repeated

conduct."  Id.  "The "unlawful employment practice" therefore cannot be said to

occur on a particular day."  Id.  "It occurs over a series of days or perhaps years,

and in direct contrast to discrete acts, a single act of harassment may not be

actionable on its own."  Id.  Title VII is violated "when the workplace is permeated

with discriminatory intimidation, ridicule, and insult that is sufficiently severe or

pervasive to alter the conditions of the victim's employment and create an abusive

working environment."  Id.

In her complaint, plaintiff alleges that she suffered from a hostile work

environment because she was accused by the Director of the Higher Education

Center of submitting a dishonest budget; that Dr. Stefkovich once said in plaintiff's

presence 'you/people like you give me trouble'; that plaintiff was assigned a

heavier course load than other professors; and that plaintiff received lower raises

than other professors.

Plaintiff does not specify in her complaint if her harassment claim is based

on race, sex or both.  Regardless, plaintiff has not set forth any hostile work environment claim whatsoever.  Plaintiff points to no evidence that any action was taken because of her race or sex.  She makes no attempt to show that but for her sex or race, she would not have been subject to these alleged acts.  Moreover, plaintiff points to just two discrete acts to attempt to form a prima facie case.  Two discrete acts do not constitute a severe or pervasive hostile work environment so as to alter her conditions of employment.  See Morgan 536 U.S. at 115. There is no evidence of the repeated conduct necessary to establish a claim of hostile work environment.

Because plaintiff has not made a prima facie case of a hostile work environment, we will grant defendant's motion for summary judgment on this count.

## Count V

## Breach of Contract

In her complaint, plaintiff alleges that defendant has not fulfilled its obligations under the April 16, 2002 agreement between the parties that "[o]n October 1, 2002, [e]mployee will resume her tenured position as Professor of Higher Education and Educational Theory and Policy in the College of Education."

Defendant argues in its brief in support of its motion for summary judgement that this court should decline to exercise supplemental jurisdiction, or, in the alternative that plaintiff's contract claim should be dismissed as untimely. Additionally, defendant argues that plaintiff has not presented sufficient evidence to support a breach of contract claim.

With certain enumerated exceptions, "in any civil action of which the district court[] ha[s] original jurisdiction, the district court[] shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  28 U.S.C. § 1367(a).   The federal and state claims are part of the same "case or controversy" if they "derive from a common nucleus of operative fact." See City of Chi. v. Int'l College of Surgeons, 522 U.S. 156, 165 (1997), (citing United Mine Workers v. Gibbs, 383 U.S. 715, 725 (1966) (superseded by statute, 28 U.S.C. § 1367).

This court has original jurisdiction over counts I-IV.  See 28 U.S.C. § 1331. Defendant argues that this court should decline to exercise supplemental jurisdiction over plaintiff's breach of contract claim.  Although plaintiff makes an argument in response that is completely unrelated to the issue of whether this court

should exercise supplemental jurisdiction[10], this court does believe the breach of

contract claim is part of the same case or controversy as the four prior counts in the

complaint and chooses to exercise supplemental jurisdiction over count V of the

complaint.

"To support a claim for breach of contract, a plaintiff must allege: 1) the

existence of a contract, including its essential terms; 2) a breach of a duty imposed

by the contract; and 3) resultant damage."  Church v. Tentarelli, 953 A.2d 804, 808

(Pa. Super. Ct. 2008).

In her complaint, plaintiff asserts the following to support her claim of

breach of contract:   "Paragraph Four (4) of the Agreement states in pertinent part,

"On October 1, 2002, Employee will resume her tenured position as Professor of

Higher Education and Educational Theory and Policy in the College of Education."

(Rec. Doc. No. 1 at ¶ 55).  "Defendant has not fulfilled its obligations under the

Agreement relative to Plaintiff's position." (Id. at ¶ 56). "Further, Plaintiff has

experienced and continues to experience different and/or negative treatment by

---

[10]In response to defendant's argument that this court should decline to
exercise supplemental jurisdiction, plaintiff makes an argument on 'futility,' in the
context of a motion for leave to amend a complaint, and argues the standard of
review for a 12(b)(6) motion.  Based on her completely unrelated arguments, it
seems that plaintiff completely misunderstands the concept of supplemental
jurisdiction.

Defendant, which treatment differs from that of her colleagues who are tenured full-time professors."

Plaintiff's breach of contract claim fails as a matter of law. Plaintiff has failed to put forth any evidence whatsoever of the alleged breach.  Moreover, plaintiff has failed to set forth reasonable proof that she has suffered any damages as a result of Penn State's alleged breach.

Defendant has set forth facts, with adequate references to the record, that Dr. Lindsay has taught courses in both Higher Education and in Educational Theory and Policy.  (Rec. Doc. No. 127 at 61-62 and Rec. Doc. No. 181-3 at ¶ 8).[11] Dr. Lindsay does not dispute that she was a tenured professor of Higher Education and Educational Theory and Policy in the College of Education.  In her brief, Dr. Lindsay argues that teaching cross-listed courses does not fulfill the dual appointment terms and for the first time argues that Penn State breached the confidentiality provision of the agreement. (Rec. Doc. No. 162 at 29-30).

Once the moving party meets its burden of showing an absence of genuine issues of material fact, the nonmoving party must provide some evidence that issue

---

[11]To the extent that Dr. Evensen's affidavit is the subject of a Motion to Strike, the portion of her affidavit that lists the courses plaintiff has taught is not the subject of the Motion to Strike. Furthermore, plaintiff has admitted in her response to Defendant's Statement of Material Facts that plaintiff's courses have been cross-listed.

of material fact remains.  <u>Matushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475

U.S. 574, 586 (1986).  The nonmoving party, however, cannot do so by merely

offering general denials, vague allegations, or conclusory statements; rather the

party must point to specific evidence in the record that creates a genuine issue as to

a material fact.  <u>Celotex</u>, 477 U.S. at 32; <u>Ridgewood Bd. of Educ. v. N.E. ex rel.</u>

<u>M.E.</u>, 172 F.3d 238, 252 (3d Cir. 1999).  Dr. Lindsay argues that teaching cross-

listed courses does not fulfill the dual appointment terms of the agreement.  (Rec.

Doc. No. 162 at 29-10).  Dr. Lindsay points to no specific evidence in the record to

create a genuine issue as to a material fact.  She points to paragraph 173 of her

Revised Statement of Material Facts (Rec. Doc. No. 145) filed in support of her

own motion for summary judgment.  This paragraph simply quotes paragraph four

of the April 2002 agreement between the parties.  She sets forth no evidence of a

breach by Penn State.  Furthermore, the court will not consider her argument,

presented for the first time by brief, that Penn State also breached the

confidentiality portion of the agreement.  This has not been pled by complaint or

amended complaint, and thus Penn State has had no notice that Dr. Lindsay

intended to bring a claim of breach based on the confidentiality portion of the

agreement.  We will not consider new theories of the case brought for the first time

in a brief opposing summary judgment.  For all of the foregoing reasons, Dr.

Lindsay's breach of contract claim fails as a matter of law.

## VI.  Conclusion

For all of the foregoing reasons, we will grant defendant's motion for summary judgment, and will enter final judgment in favor of defendant and against plaintiff.

                             /s James F. McClure, Jr.

                            James F. McClure, Jr.
                            United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DR. BEVERLY LINDSAY,           :
                               :
              Plaintiff,       :          No. 4:06-CV-01826
                               :
     v.                        :          (Judge McClure)
                               :
THE PENNSYLVANIA STATE         :
UNIVERSITY,                    :
                               :
              Defendant.       :

# O R D E R

March 11, 2009

In accordance with the accompanying Memorandum,

**IT IS HEREBY ORDERED THAT:**

1.  Defendant's Motion for Summary Judgment is GRANTED.  (Rec. Doc. No.  126).

2.  Final judgment is entered in favor of defendant and against plaintiff.

3.  The clerk is directed to close the case file.

        /s James F. McClure, Jr.
        James F. McClure, Jr.
        United States District Judge